IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| CHRIS CABRAL and NANCY TARSITANO, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 3:13-cv-00139-SEB-WGH ) |
| CITY OF EVANSVILLE, INDIANA, | ) ) ) |
| Defendant. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

INTRODUCTION

During the week of June 17, 2013, the Board of Public Safety of the City of Evansville, Indiana ("the City"), voted 2-0 (with one member not present) to display thirty (30) eight-foot-tall crosses on public property in the popular riverfront area of its downtown. These crosses have been constructed by a Christian church, will be decorated by children attending a vacation Bible school, and are set to be erected beginning August 4th unless their display is enjoined by this Court. The Latin cross is, of course, the most readily recognizable symbol of the Christian faith in the world, and the City's action will cause this symbol to be viewed on public property by thousands of persons each day. Both Chris Cabral and Nancy Tarsitano are local residents whose daily lives cause them to pass the area where the crosses will be displayed; they object strenuously to the display. A reasonable observer coming into contact with the crosses would conclude that the City has endorsed religion and, as such, the display of these crosses violates the Establishment Clause of the First Amendment to the United States Constitution. A preliminary injunction is warranted.

1

STATEMENT OF FACTS

It is anticipated that the following facts will be adduced during the preliminary injunction hearing in this cause:

I.  **Facts Concerning the City of Evansville and Its Riverfront Area**

The City of Evansville, Indiana ("the City"), is a sizeable municipality located in Vanderburgh County in the southwest corner of Indiana. The City has a population of approximately 120,000 persons.[1]

The City's riverfront (or riverfront esplanade) ("the Riverfront") is a popular area of the City's downtown that abuts the Ohio River and that is owned and operated by the City. The Riverfront is approximately a mile and a half in length and exists on and around Riverside Drive (also known at this location as Veterans Memorial Parkway), which is a large thoroughfare in the City. The Riverfront is generally considered to begin in the northwest at the Tropicana Evansville (a casino that until recently was called "Casino Aztar") and Court Street and to end in the southeast at Sunrise Park and Shawnee Drive. The northwest portion of the Riverfront—which, as set forth below, is the area primarily at issue in this litigation—is approximately half a mile from the main governmental offices in the City.

The Riverfront is an aesthetically pleasing portion of the City, and is one of the City's most popular gathering spots. During daylight hours, it offers picturesque views of the Ohio River and the City's skyline, and the area contains numerous popular destinations. It passes the Evansville Museum of Art, History, and Science; the Evansville Pagoda, Convention, and Visitor Bureau; the Four Freedoms Monument; Dress Plaza; and Sunrise Park. It also contains a trail

---

[1] *See* U.S. Census Bureau, *State & County QuickFacts: Evansville, Indiana*, *at* http://quickfacts.census.gov/qfd/states/18/1822000.html (last visited July 2, 2013). This Court can, of course, take judicial notice of census data. *See, e.g.*, *Barnett v. Daley*, 32 F.3d 1196, 1198 (7th Cir. 1994).

and greenway between Riverside Drive and the Ohio River. The following is a photograph, available through the City's webpage (http://www.evansvillegov.org/Index.aspx?page=2102 [last visited July 2, 2013]), of a portion of the greenway trail:



Because numerous businesses within the City are close to the Riverfront, it is also a popular destination for persons during the lunch hour, whether they are walking on the trail or having a picnic (or otherwise enjoying the sun) on one of the grassy areas of the Riverfront. Persons may engage in other outdoor activities on the Riverfront, such as throwing a Frisbee or kicking a soccer ball, and the Riverfront (or areas nearby) also hosts concerts and other events throughout the year.

All told, thousands of persons traverse the Riverfront every single day.

## II.   Facts Concerning the Anticipated Erection of Thirty (30) Crosses

During the week of June 17, 2013, the City—through its Board of Public Works—gave permission to West Side Christian Church ("the Church") to display thirty (30) decorative

crosses on public property along the Riverfront for two (2) weeks between August 4th and August 18th of 2013.  Each of the crosses will appear as follows:



Each of the thirty (30) crosses is eight (8) feet tall and made of polyethylene (that is, plastic).  They will be decorated by children attending a vacation Bible school camp at the Church—the decorations are, of course, not included on the above picture—although the City interprets its local ordinances to prohibit any writing on the crosses.  The Church is located on the west side of the City, several miles from the Riverfront.

The crosses will be installed on the Riverfront along Riverside Drive between Court Street and Locust Street.  This is the four-block stretch of Riverside Drive nearest the City's downtown.  It has not yet been decided whether the crosses will be placed on the curb of Riverside Drive (directly abutting the street) or whether they will be placed against a concrete

wall on the opposite side of the greenway trail (with the trail between the crosses and Riverside Drive). However, a portion of the Riverfront where the crosses are likely to be installed appears as follows:



The location where the crosses are to be installed is public property owned and operated by the City.

### III.   Facts Concerning the Plaintiffs

Chris Cabral and Nancy Tarsitano are both adult residents of Vanderburgh County, Indiana.

Mr. Cabral works in the City's downtown area and passes the Riverfront, including the area where the thirty (30) crosses are to be displayed, on a daily basis. Additionally, he and his

wife have occasionally taken their children to the Riverfront area to enjoy the amenities that that area has to offer. However, if the crosses are displayed on the Riverfront, he intends to find a different route to and from work and other downtown locations, as well as to refrain from visiting any business in the area, in order to avoid coming into contact with the crosses while they are displayed.

Ms. Tarsitano lives on Riverside Drive in the City's downtown, and will likely be able to see the area where the thirty (30) crosses are to be displayed out of her window. She drives up and down Riverside Drive on a daily basis, and usually passes the area where the crosses are to be displayed multiple times each day. Additionally, she routinely walks her dog on the Riverfront's greenway, including immediately past the area where the crosses are to be displayed.

Mr. Cabral and Ms. Tarsitano feel strongly that the City should not endorse or advance any religious viewpoint or religion in general, and they therefore object to the display of the crosses on the Riverfront.

## STANDARD OF REVIEW

The standard in the Seventh Circuit for the granting of a preliminary injunction is clear. In order to determine whether a preliminary injunction should be granted, the Court weighs several factors:

(1) whether the plaintiff has established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial;

(2) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue;

(3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and

>    (4) whether, by the grant of the preliminary injunction, the public interest would be disserved.

*See, e.g.*, *Baja Contractor, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987).  The heart of this test, however, is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it."  *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984).  After weighing these factors, it is clear that a preliminary injunction should issue in this case.

## ARGUMENT

**I.**   **Likelihood of Success on the Merits**

   *A.  Background to Establishment Clause Analysis*

The First Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion."  U.S. CONST. amend. I.  This provision, among other things, "prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'"  *County of Allegheny v. ACLU*, 492 U.S. 573, 594 (1989) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring)).  In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Supreme Court established a three-part test to determine whether governmental action runs afoul of the Establishment Clause: in order to pass constitutional muster, (a) the action must have a secular purpose, (b) the action must have a principal or primary effect that neither advances nor inhibits religion, and (c) the action must not foster excessive governmental entanglement with religion.  *Id.* at 612–13; *see also, e.g.*, *Agostini v. Felton*, 521 U.S. 203 (1997).

The so-called *Lemon* test has been subjected to much criticism by Members of the Supreme Court and, as this internal criticism has mounted, a number of cases have redefined the first two (2) prongs under a so-called "endorsement" test.  *See, e.g.*, *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995); *County of Allegheny*, *supra*; *Cohen v. City of Des Plaines*, 8 F.3d 484 (7th Cir. 1993).  Thus, in *Freedom from Religion Foundation v. City of Marshfield*, 203 F.3d 487 (7th Cir. 2000), the Seventh Circuit noted as follows:

> Following the Court's formal acceptance in *County of Allegheny*, the effect prong of th[e *Lemon*] test has been analyzed under the "perception of endorsement" test developed in *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring).  Under this test, the effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.  When [a court] find[s] that a reasonable person could perceive that a government action conveys the message that religion or a particular religious belief is *favored* or *preferred*, the Establishment Clause has been violated.

*Id.* at 493 (selected quotations and citations omitted).  The endorsement test "dispenses with *Lemon*'s 'entanglement' prong and, combining with an objective version of *Lemon*'s 'purpose' prong with its 'effect' prong, asks whether a reasonable observer familiar with the history and contact of a religious display would perceive it as a government endorsement of religion." *Stratechuk v. Board of Educ.*, 587 F.3d 597, 608–09 (3d Cir. 2009).

Thus, while the Supreme Court has continued to hold that *Lemon* remains alive and viable, *see, e.g.*, *McCreary County v. ACLU*, 545 U.S. 844, 859 (2005); *Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 507 (7th Cir. 2010), it has been largely supplanted by the endorsement test in challenges to religious displays on public property, *see, e.g.*, *Modrovich v. Allegheny County*, 385 F.3d 397, 401 (3d Cir. 2004) ("[T]he endorsement test modifies *Lemon* in cases involving religious displays on public property.").  Under the rubric of this test, the religious display at

issue in this case is plainly unconstitutional. And, even if the traditional *Lemon* test is applied, the display is still unconstitutional.

> B. *The City's display of thirty (30) eight-foot-tall crosses constitutes an impermissible endorsement of religion*

The "endorsement" test focuses not on the actual benefit bestowed to a religious institution, but on how that benefit is *perceived*. "Every government practice must be judged in its unique circumstances to determine" if there has been an endorsement. *Lynch v. Donnelly*, 465 U.S. 668, 694 (1984) (O'Connor, J., concurring). The issue, therefore, is whether a reasonable observer would deem the transaction to constitute an endorsement of religion. *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 779 (1995) (O'Connor, J., joined by Souter and Breyer, JJ., concurring in part and concurring in the judgment) (controlling opinion).[2] As the inquiry focuses on whether a person would believe an endorsement has occurred, the analysis is "fluid, and varies from case to case." *Cohen v. City of Des Plaines*, 8 F.3d 484, 489 (7th Cir. 1993) (citation omitted). Consequently, the inquiry "necessarily calls for line-drawing; no fixed *per se* rule can be framed.'" *Id.* (same).[3]

---

[2]  The lead opinion in *Pinette* was a four-justice plurality opinion. Both Justice O'Connor and Justice Souter wrote separate concurrences (joined both by each other and by Justice Breyer). As the narrowest opinions necessary to the Court's judgment, these separate concurrences—which largely mirror one another—are therefore jointly the controlling opinions. *See Marks v. United States*, 430 U.S. 188, 193 (1977); *see also Grosjean v. Bommarito*, 302 Fed. App'x 430, 436 n.1 (6th Cir. 2008) ("Under the *Marks* doctrine, it appears that the concurring opinions of Justice Souter and Justice O'Connor were the more narrow, and therefore controlling, grounds for judgment in" *Pinette*.) (internal citation omitted).

[3]  Of course, the Establishment Clause prohibits only religious displays that may fairly be attributed to the government, and does not forbid private religious speech. The mere fact that a monument is prepared or donated by a private group, however—as has been done here—is not controlling. Rather, the question is whether "the City has 'effectively controlled' the messages sent by the monuments . . . by exercising 'final approval authority' over their selection." *Pleasant Grove City v. Summum*, 555 U.S. 460, 473 (2009) (quoting *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 560–61 (2005)). Here, of course, the display of the crosses was

As seems self-evident, "the Latin cross . . . is the principle symbol of Christianity around the world, and display of the cross [can]not reasonably be taken to have any secular point." *Pinette*, 515 U.S. at 792 (Souter, J., concurring in part and concurring in the judgment) (joint controlling opinion). The Seventh Circuit has thus recently described this symbol as follows:

> That symbol [the Latin cross] carries deeply significant meaning for those who adhere to the Christian faith. Moreover, it is a symbol that invites veneration by adherents. The cross, like many symbols, is pregnant with expressive content. It acts as a short cut from mind to mind for adherents who draw strength from it and for those who do not ascribe to Christian beliefs.

*Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 852 (7th Cir. 2012) (*en banc*), *cert. pending*, No. 12-755 (internal quotations and citations omitted). *See also, e.g.*, *Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1022 (10th Cir. 2008) ("The Christian or Latin cross—a cross with three equal arms and a longer foot—reminds Christians of Christ's sacrifice for His people. Accordingly, it is unequivocally a symbol of the Christian faith.") (internal citations omitted); *Harris v. City of Zion*, 927 F.2d 1401, 1412 (7th Cir. 1991) ("[T]he obvious presence of a Latin cross on the corporate seal . . . also endorses or promotes a particular religious faith. It expresses an unambiguous choice in favor of Christianity. It presents to any observer a clear endorsement of all those beliefs associated with a Latin cross.").

Given the undeniable religious significance of this symbol, "there is little doubt that [a governmental entity] would violate the Establishment Clause if it allowed a private group to place a permanent unadorned twelve-foot cross on public property without any contextual of

---

approved by a 2-0 vote of the City's Board of Public Safety. This suffices to make their message attributable to the City, and the City may not argue to the contrary. *See also, e.g.*, *Miller v. City of Cincinnati*, 622 F.3d 524, 536–37 (6th Cir. 2010) ("[T]he public reasonably interprets privately financed and donated monuments that the government accepts and displays to the public on government land as conveying the government's views.") (internal quotation omitted); *Rothamel v. Fluvanna County*, 810 F. Supp. 2d 771, 786 (W.D. Va. 2011) ("When governmental bodies accept donated monuments and place them on public property, the monuments are meant to convey and have the effect of conveying a government message.").

historical elements that served to secularize the message conveyed by such a display." *American Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1120 (10th Cir. 2010). Thus, numerous courts have invalidated religious displays of this symbol that cannot be meaningfully distinguished from the present case. *See, e.g.*, *id.* at 1121–24 (holding unconstitutional the display of 12-foot-tall crosses as roadside memorials); *Buono v. Norton*, 371 F.3d 543, 548–50 (9th Cir. 2004) (holding that an eight-foot-cross displayed in a national preserve violated the Establishment Clause); *Separation of Church & State Comm. v. City of Eugene of Lake County*, 93 F.3d 617, 619–20 (9th Cir. 1996) (holding unconstitutional the display of a 51-foot-cross in a city park); *ACLU of Georgia v. Rabun County Chamber of Commerce, Inc.*, 698 F.2d 1098, 1110–11 (11th Cir. 1982) (holding that a lighted thirty-five-foot stand-alone cross could not be displayed in a state park); *Libin v. Town of Greenwich*, 625 F. Supp. 393, 399–400 (D. Conn. 1985) (concluding that the display of a cross on the façade of a firehouse during the Christmas season violated the Establishment Clause); *cf. County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 599 (1989) (using the display of a cross in a government building as the prototypical example of a display that would convey "endorsement of Christianity"); *City of Zion*, 927 F.2d at 1413 (holding that the display of a Latin cross on a city's seal violated the Establishment Clause).

It is, of course, true that many of these cases (although not all of them) concerned the permanent display of the Latin cross, rather than its temporary display. Certainly "a religious display that is large and long-standing more intensely communicates a religious message than a smaller, more temporary display." *Kreisner v. City of San Diego*, 1 F.3d 775, 795 (9th Cir. 1993). *See also Indiana Civil Liberties Union v. O'Bannon*, 110 F. Supp. 2d 842, 858 (S.D. Ind. 2000) (Barker, J.) ("Th[e] aura of permanence strengthens the message of endorsement that a

11

reasonable person would perceive."), *aff'd*, 259 F.3d 766 (7th Cir. 2001). However, this is but one factor in the endorsement analysis, and courts at all levels have routinely invalidated even temporary or seasonal religious displays. *See, e.g.*, *County of Allegheny*, 492 U.S. at 598–602 (display of crèche in county courthouse); *Gilfillan v. City of Philadelphia*, 637 F.2d 924, 930–31 (3d Cir. 1980) (temporary platform dedicated to visit by the Pope). The relevant question is simply whether "a reasonable person could perceive that a government action conveys the message that religion or a particular religious belief is *favored* or *preferred*." *City of Marshfield*, 203 F.3d at 493.

Moreover, the "reasonable observer" under the endorsement analysis "is presumed to be informed and familiar with the history of the government practice at issue." *Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523, 528 (7th Cir. 2009) (internal quotation and alterations omitted). Thus, while the religious significance of the crosses to be displayed by the City cannot be denied, this is not the only fact by which the City's endorsement of religion is to be measured. Rather, the "reasonable observer" in this case must also be presumed to be aware (a) that the crosses have been provided by a religious institution (the Church), (b) that they have been decorated by children attending a vacation Bible school, and (c) that they have only been permitted to be erected on the Riverfront following the unanimous vote of the City's Board of Public Works.

Clearly a reasonable observer aware of all of these facts would conclude that the City had endorsed religion, and the religious display at issue here is unconstitutional.

  *C. The City's display of thirty (30) eight-foot-tall crosses violates the traditional Lemon test*

Finally, even if the endorsement test is not applied, the religious display at issue in this case violates the first two (2) prongs of the traditional *Lemon* test.

1. <u>The religious display has no secular purpose</u>

First, the display of thirty (30) eight-foot-tall crosses on public property has no secular purpose. *Lemon*, 402 U.S. at 612–13. Under this prong of the *Lemon* test, government action will be deemed unconstitutional "only if it is motivated wholly by an impermissible purpose." *Bowen v. Kendrick*, 487 U.S. 589, 602 (1988); *see also, e.g.*, *Cammack v. Waihee*, 932 F.2d 765, 774 (9th Cir. 1991).

> The general rule when attempting to determine the purpose behind a government action is to consult and to defer to the stated purpose of the action. While the secular purpose need not be the exclusive purpose for taking the action, it must be sincere and not a sham to avoid a potential Establishment Clause violation. Since the avowed purpose may not be a 'sham,' courts have looked at both the context of the display as well as the content of the display to determine if the purpose is in fact secular.

*O'Bannon*, 110 F. Supp. 2d at 849 (internal citations omitted). While this is certainly a demanding standard, it is one that is met in this case: after all, given both the nature of the religious symbol and the fact that they have been created by a religious institution (and will be decorated by Bible school students), the motivation underlying their display seems self-evident. Moreover, when governmental action is religious on its face, the burden of demonstrating a secular purpose rests on the government. *See Metzl v. Leininger*, 57 F.3d 618, 622 (7th Cir. 1995). While the City's purpose is presently unclear, it cannot carry its burden.

In media reports, the City's attorney was quoted as insisting that the crosses "might be a religious symbol to someone or they might be attractive statues to someone else." *See* John Martin, *Church Receives Approval to Erect Decorative Cross Display Along Riverfront*, EVANSVILLE COURIER & PRESS, June 20, 2013, *available at* http://www.courierpress.com/news/2013/jun/20/old167 (last visited July 2, 2013). This, of course, ignores the nature of the Latin cross and the manner in which it is universally accepted as a symbol of the Christian faith. It

13

also ignores the fact, discussed at length above, that the crosses have been designed by a Christian church and decorated by Bible school students. No person who comes into contact with the crosses will be under the misconception that they are a secular symbol, and the City cannot argue to the contrary. *Cf. O'Bannon*, 110 F. Supp. 2d at 850–51 (citing several cases for the proposition that the display of the Ten Commandments has no valid secular purpose and, in so doing, relying on the fact "that the Ten Commandments is undeniably a sacred text").

More recently, a member of the Church has been quoted as indicating that the display of the crosses is intended to "bring people to the riverfront who wouldn't otherwise come." *See* Eric Bradner, *ACLU Files Suit Over Evansville Plan for Public Crosses*, THE INDYCHANNEL, June 25, 2013, *available at* http://www.theindychannel.com/news/local-news/aclu-fights-evansville-plan-for-public-crosses (last visited July 2, 2013). Confronting this precise argument, the Eleventh Circuit has held as follows: "Although the promotion of tourism is a secular goal commonly pursued by states, cities and counties alike, a government may not 'employ religious means to reach a secular goal unless secular means are wholly unavailing.'" *Rabun County*, 698 F.2d at 1111 (quoting *School Dist. of Abington Twp. v. Shempp*, 374 U.S. 203, 294 (1963) (Brennan, J., concurring)). *Cf. Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 495 (2d Cir. 2009) (concluding that religious brochures on the counter of a post office "fail spectacularly under the first inquiry of *Lemon*"). No secular purpose underlies the crosses' display.

    2.   <u>The principal effect of the religious display is religious in nature</u>

Under the second prong of the *Lemon* test, courts ask, "irrespective of the . . . stated purpose, whether accepting th[e] monument for display . . . has the primary effect of conveying a message that the [government] is advancing or inhibiting religion." *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 772 (7th Cir. 2001). The Seventh Circuit has made clear,

however, that at least in the context of religious displays this inquiry merges with the endorsement inquiry detailed above. *See id.* ("The question [under the 'effects' prong] is: would a reasonable person believe that the display amounts to an endorsement of religion?"). Unlike in *O'Bannon*, however—or in other cases concerning the display of religious monuments in the context of a larger display including secular texts or historic perspective, *see O'Bannon*, 110 F. Supp. 2d at 854–56 (describing a series of such cases)—the City here cannot even attempt to argue that other factors "help neutralize any religious message emanating from the [monument]." 259 F.3d at 772. The bottom line is that, when viewing thirty (30) eight-foot-tall crosses on public property, "[a] reasonable person will think religion" and "[n]othing in the context of the monument itself or the surrounding grounds mitigates the religious message conveyed." *Id.* at 773.

As described in greater detail above, the display has the principal effect of advancing religion.[4]

## II.     Irreparable Harm with No Adequate Remedy at Law

Next, absent a preliminary injunction the plaintiffs will suffer irreparable harm for which there is no adequate remedy at law. Of course, at this point it is well-established that the denial of constitutional rights is irreparable harm in and of itself. "Courts have . . . held that a plaintiff

---

[4] The third and final prong of the *Lemon* test asks whether a religious display constitutes an excessive entanglement between the government and religion. In order to determine whether a display satisfies this prong, courts generally look to a variety of factors. These include (a) "evidence of contact with church authorities concerning the content or design of the exhibit"; (b) whether "expenditures for maintenance of the [exhibit] have been necessary"; and (c) the extent of the "tangible material" that the government contributes to the display. *See Lynch v. Donnelly*, 465 U.S. 668, 684 (1984). Given that this prong of the *Lemon* test typically requires "comprehensive, discriminating, and continuing [governmental] surveillance" or "enduring entanglement," *Lemon*, 403 U.S. at 619–22; *see also Lynch*, 465 U.S. at 684, the plaintiffs admit that it is unlikely that the religious display at issue here violates this final prong of *Lemon*. Nonetheless, they reserve their right to argue that information adduced during discovery reveals unconstitutional entanglement as well.

can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see also, e.g.*, *Cohen v. Coahoma County, Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992) ("It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law."). Indeed, in the First Amendment context, the Supreme Court has noted specifically that the violation of the First Amendment, for even "minimal periods of time," is "unquestionably . . . irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). *See also, e.g.*, *ACLU v. City of St. Charles*, 794 F.2d 265, 275 (7th Cir. 1986) (applying same principle to Establishment Clause context); *Tanford v. Brand*, 883 F.Supp. 1231, 1237 (S.D. Ind. 1995) (same).

There is no adequate remedy at law that can address this irreparable harm. *See, e.g.*, *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) (holding that "money damages are [an] inadequate" remedy for the loss of First Amendment freedoms). Indeed, this fact is underscored in the present case where, if the display of the crosses is not promptly enjoined, there will likely be no mechanism for the plaintiffs to ever receive a judgment on the merits of their claim: after all, these crosses are set to be displayed for two (2) weeks in early August of 2013; an injunction after their display would come too late.

**III.   Public Interest and Balancing of the Harms**

As with the irreparable harm requirement, courts apply a *per se* rule as to the remaining preliminary injunction factors once a plaintiff demonstrates a likelihood of success on the merits: "[v]indication of constitutional freedoms is in the public interest." *See, e.g.*, *McIntire v. Bethel Sch.*, 804 F.Supp. 1415, 1429 (W.D. Okla. 1992). Because the plaintiffs have demonstrated a

substantial likelihood of success on the merits of their claim, "no substantial harm to others can be said to inhere in its enjoinment." *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001); *see also, e.g.*, *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). A governmental entity cannot claim that requiring it to comply with the First Amendment to the United States Constitution is harmful. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the] claimed harm is no harm at all"). Similarly, "injunctions protecting First Amendment freedoms are always in the public interest." *Id.* at 859. As the Sixth Circuit has similarly held, it is "always in the public interest to prevent violation of a party's constitutional rights." *Déjà vu of Nashville*, 274 F.3d at 400 (quoting *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).

Thus, against the certain and irreparable harm that will be caused to the plaintiffs if an injunction does not issue is the non-existent harm faced by the City. These last two (2) requirements of the preliminary injunction calculus are met as well.

## THE INJUNCTION SHOULD ISSUE WITHOUT BOND

The issuance of a preliminary injunction will not impose any monetary injuries on the City. In the absence of such injuries, no bond should be required. *E.g.*, *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). To require a bond in the present case would be to condition the exercise of the plaintiffs' constitutional rights on their ability to pay. No bond should be required.

## CONCLUSION

For the foregoing reasons, a preliminary injunction should issue, without bond, prohibiting the City from displaying or allowing to be displayed on public property the crosses that are the subject of this litigation.

      */s/ Gavin M. Rose*
Gavin M. Rose
ACLU OF INDIANA
1031 E. Washington St.
Indianapolis, IN  46202
317.635.4059, x106
<grose@aclu-in.org>

*Attorney for the plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certified that a true copy of the foregoing was filed electronically on this 3rd day of July, 2013. Parties may access this filing through the Court's electronic system. I further certify that a true copy of the foregoing was sent to the following parties by operation of the Court's electronic system on this 3rd day of July, 2013.

    Keith W. Vanderahe, kvanderahe@zsws.com

                                      */s/ Gavin M. Rose*
                                      Gavin M. Rose
                                      Attorney at Law