UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| CHRIS CABRAL,<br>NANCY TARSITANO,<br><br>                 Plaintiffs,<br><br>                 vs.<br><br>CITY OF EVANSVILLE, INDIANA,<br><br>                 Defendant,<br><br>WEST SIDE CHRISTIAN CHURCH,<br><br>                 Intervenor. | )<br>)<br>)<br>)<br>)<br>) No. 3:13-cv-00139-SEB-WGH<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER**

This matter is before the Court on Plaintiffs' request for injunctive relief seeking an order enjoining Defendant, the City of Evansville ("the City"), from permitting the erection on public property of a display of up to thirty-one, six-foot-tall crosses ("the Crosses") to remain in place over a two-week period sponsored by and scheduled to be decorated by a group of local churches. On June 20, 2013, the City's Board of Public Works approved by a 2-0 vote the permit application filed by West Side Christian Church ("the Church") on behalf of itself and several other private religious organizations. The display of the Crosses is scheduled to span out over a four-block area which is part of the City's popular, well-traveled riverfront area, between August 4, 2013 and August 18, 2013.

1

On June 25, 2013, Plaintiffs Chris Cabral and Nancy Tarsitano filed this lawsuit including their motion for preliminary injunction to enjoin the above described display, arguing that the City's approval of it constitutes an endorsement of religion, in violation of the Establishment Clause of the First Amendment. The parties thereafter filed a joint motion to consolidate the preliminary injunction hearing with the final trial on the merits, which the Court granted. A hearing was conducted by the Court on Wednesday, July 18, 2013, prior to which West Side Christian Church and nine other private religious organizations who intend to participate in the event by decorating the respective crosses moved to intervene in the litigation on the grounds that their intervention is necessary to allow them to protect their constitutional right to express their private viewpoint in a public forum pursuant to the Free Exercise and Free Speech Clauses of the First Amendment. At the July 18th hearing, the Court granted West Side Christian Church's request to intervene, but denied the requests of the other nine religious organizations, ruling that West Side Christian Church had been the only applicant for the original permit and only permittee to receive the City's authorization to erect the display.

This dispute highlights the tension that often arises between the Establishment Clause and the Free Exercise and Free Speech Clauses of the First Amendment to the Constitution, which provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech …." U.S. CONST. amend. I. The Court, attempting to resolve this tension here, seeks to strike a proper balance between the private religious speech of the churches scheduled to play out in the public forum known as the Riverfront located in

Evansville. The important legal distinction that underlies the "crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect," is well established. *Board of Educ. of Westside Community Schs. v. Mergens*, 496 U.S. 226, 250 (1990) (O'Connor, J., concurring) (emphasis in original). But, as the Tenth Circuit recently recognized in *American Atheists, Inc. v. Duncan*, 637 F.3d 1095 (10th Cir. 2010): "[C]ourts have struggled mightily to articulate when government action has crossed the constitutional line." *Id.* at 1117 (citing *Bauchman ex. rel. Bauchman v. W. High Sch.*, 132 F.3d 542, 551 (10th Cir. 1997) (observing the Supreme Court's failure to "prescribe a general analytic framework within which to evaluate Establishment Clause claims," as well as the fact that "many believe the Court's modern Establishment Clause jurisprudence is in hopeless disarray") (citation and quotation omitted). The acknowledged ambiguity infusing the precedential decisions which this Court must interpret and apply relating to the legal standards in First Amendment jurisprudence leaves us and other government policymakers "in a vise between the Establishment Clause on one side and the Free Speech and Free Exercise Clauses on the other." *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 768 (1995) (plurality opinion).

In applying First Amendment principles, every decision is highly fact sensitive; but applying those facts to the established precedent is neither straightforward nor easy. Having carefully considered the parties' briefing and arguments, the documentary evidence, and the controlling legal authorities, we hold, for the reasons set forth in detail

below, that the City's approval of this display of crosses constitutes an impermissible endorsement of religion that violates the Establishment Clause of the First Amendment.

### Findings of Fact

**I.      The City and the Riverfront Area**

The City of Evansville is a sizeable, thriving municipality located in Vanderburgh County in the southwest corner of Indiana. Its population numbers approximately 120,000 persons. The City's riverfront area ("the Riverfront") extends over approximately a mile and a half of park-like public space contiguous to the Ohio River which directly overlooks the River's scenic vistas. The Riverfront encompasses and surrounds a large and busy thoroughfare referred to as Riverside Drive (also known as Veterans Memorial Parkway) and extends generally from its northwest boundary which adjoins the Tropicana Evansville (a casino that until recently was called "Casino Aztar") and Court Street to its southeast boundary at Sunrise Park and Shawnee Drive. Affidavit of Chris Cabral ("Cabral Aff.") ¶ 3; Affidavit of Nancy Tarsitano ("Tarsitano Aff.") ¶ 3. The Riverfront is a popular gathering spot in Evansville offering recreational space and picturesque views of the Ohio River and the City's skyline. It is home to a number of popular civic and cultural venues, including the Evansville Museum of Art, History and Science; the Evansville Pagoda, Convention, and Visitor Bureau; the Four Freedoms Monument; Dress Plaza; Sunrise Park; and a trail and greenway located between Riverside Drive and the Ohio River. Compl. ¶ 12. The parties agree that thousands of people traverse the Riverfront on a daily basis.

The portion of the Riverfront where the Crosses are to be displayed extends over four contiguous blocks that directly abuts the stretch of Riverside Drive[1] nearest to the City's downtown, between Court and Locust Streets. *Id.* ¶ 17. The area contains a widened sidewalk which receives substantial use by joggers, bicyclists, and pedestrians. A large, concrete retaining wall with a permanently installed guardrail extends along the side that overlooks the Ohio River, where there is also a walkway set with pavers and permanently planted trees. Deposition of Bill Nix ("Nix Dep.") at 65. This portion of the Riverfront area is located approximately seven (7) blocks from the Civic Center, which is the locus of the City's governmental presence. The downtown area between the Riverfront and the Civic Center consists of both commercial and residential buildings which range in size from single story structures to one approximately eighteen story high structure. The Riverfront is not visible from the Civic Center, and the Civic Center is not visible from the Riverfront. There are no City offices located on the Riverfront. *Id.* at 59.

## II.    The City's Policies Regarding Use of the Riverfront

The following three City departments share responsibility for controlling the use of the Riverfront area: the Department of Parks and Recreation ("the Parks Department"), the Board of Public Safety ("the Safety Board"), and the Board of Public Works ("the Works Board"). The Parks Department oversees use of the Four Freedoms Monument, which is located next to and to the southeast of the area in which the Crosses will be

---

[1] Riverside Drive has two lanes of southeast-bound traffic, two lanes of northwest-bound traffic, and a median dotted with permanently planted trees.

displayed.  Since at least 2007, the Parks Department has approved special use permits for a variety of secular and non-secular activities, including, *inter alia*: requests for worship services, family oriented events, candlelight vigils, fire demonstrations, marches and walks, and private weddings.  *See* Dkt. No. 20-26.

The Safety Board is responsible for traffic flow along the Riverfront.  At least since the beginning of 2010, the Safety Board has approved a number of special event applications from both secular and non-secular organizations requiring closures or traffic curtailments on Riverside Drive for various events, including, *inter alia*: marathons and races, a "March for Jesus," fireworks, the Shriners Fest, and parades.  *See* Dkt. No. 20-27.

The Works Board has exclusive authority over activities occurring in the public rights of way within the City, including the streets, sidewalks, and alleys.  It is responsible for approving permit applications by groups and individuals to make private use of the Riverfront and its esplanade, including the four-block stretch at issue in this litigation.  The Works Board is established by Section 2.70.010 of the Evansville Municipal Code, which provides in pertinent part that the Board "shall have such authority as is necessary for the control and direction of the departments within the Division of Transportation and Services … and such authority as is necessary to effectuate the responsibilities of the Division of Transportation and Services.  § 2.70.010(E).  The Works Board is comprised of three members (unless a temporary vacancy occurs) appointed by and who serve at the pleasure of the City's Mayor.  However, the Works Board possesses complete autonomy with regard to decisions within

its area of lawful authority; the Mayor does not direct or otherwise intervene in specific issues before the Board. Nix Dep. at 9, 55-56. Currently, the members of the Works Board include Marty Amsler, Anthony Brooks, and Bill Nix. Mr. Nix serves as the Board's president, the position he has held since his appointment to the Board in January 2012. *Id.* at 4, 9-10.

When any entity wishes to secure permission to use the Riverfront for a display that threatens to encroach upon a public right of way, an application titled an "Application for Right-Of-Way-Permit" ("right of way application") must be filed. *Id.* at 37-39. Right of way application forms are available from the City Engineer. Upon completion of the required form by an applicant(s), the City's Engineer conducts a review of the permit application focusing on the safety concerns implicated by the request. The application is also reviewed by the City's legal counsel to identify and address any issues of a legal sort. After these reviews, the application is considered at a public hearing by the Works Board, at the conclusion of which the Board votes to approve or reject the permit application. *Id.* at 39. A majority of the three-member Works Board is required to approve an application. *Id.* at 10-11.

According to Mr. Nix, the Works Board uniformly approves permit applications that have received safety approval from the City's Engineer and approval by the City's legal counsel; the Board has never denied any permit application satisfying those requirements. *Id.* at 42, 57. Mr. Nix also testified that the Works Board has complete and full discretion to make these decisions, and, beyond complying with any applicable

7

requirements set out in various municipal ordinances,[2] there are no other written or unwritten criteria that guide the Board's discretion. *Id.* at 10-11, 14-15.

The history of uses of the Riverfront by in-person events and festivals, both secular and non-secular, is long and varied. That is not true, however, with regard to unattended displays erected there that are comparable to that at issue here. On three or four occasions after the year 2000, the Works Board has approved requests by the local United Way to erect works of art constructed out of painted concrete and placed along the portion of the Riverfront where the Crosses would be displayed. These works of art did not convey religious content; they consisted of depictions of butterflies, fish, and carousel horses, and each display remained in place for approximately three months. Deposition of Kerry Kamp ("Kamp Dep.") at 14-15. Earlier this year the Works Board approved a request from the Franklin Street Events Association for a one-day display of six recycled art sculptures to be placed in the median on Franklin Street (away from the downtown area) in observance of the group's Earth Day celebration. *Id.* at 17-19.

### III. West Side Christian Church's Application for the Cross Display

On April 30, 2013, West Side Christian Church submitted a permit application for its "Cross the River" project. In the permit, the Church requested permission to erect thirty-one (31) large plastic crosses within the Riverfront area between Court Street and Locust Street which, when finally in place will extend over four city blocks where they will remain for a two-week period, from August 4, 2013 to August 18, 2013. The permit

---

[2] Prior to presentation of a proposed display to the Board, the review performed by the City's legal counsel has included its compliance with municipal ordinances.

references the fact that each cross will measure six feet in height and forty-two (42) inches in width and be anchored to a forty-four (44) inch square base. Each cross will be sponsored and decorated by separate Christian churches in the Evansville area. Dkt. Nos. 20-17; 20-18 (Permit Applications).

West Side Christian Church's permit application was first presented to the Works Board on June 6, 2013, at a regularly scheduled meeting. At that time, the proposed display was introduced to the Works Board as "just a [means to] show [the] faith throughout the community." Dkt. No. 20-19 (6/6/2013 Board Minutes) at 4. The Works Board tabled discussion of the permit application at the June 6 meeting without making a final decision, requesting that the proposal be brought back before the Board at a future meeting, both because the request was not officially on the agenda for that meeting and because the permit application was being submitted to the Board by the manufacturer of the Crosses, rather than by a representative of West Side Christian Church.[3] Nix. Dep. at 48, 50; *see id.*

There was limited discussion of the proposal at the first meeting before the issue was tabled, specifically, insurance issues as well as safety concerns associated with the placement of the Crosses were raised and discussed. The City's legal counsel, Ted Ziemer, also addressed the Board, opining that because West Side Christian Church's original proposal included the words "Jesus Saves" being printed on each of the Crosses, the City's legal department viewed such writing to run afoul of Section 12.05.210(E)(7)

---

[3] It is the Works Board's practice to have the person or a representative of the organization seeking the permit appear and present the permit application to the Board, rather than a third party, presumably to respond to any questions the Board might have.

of the Evansville Municipal Code, which prohibits so-called "First Amendment signs."[4]

At the June 6 meeting, the City's counsel also stated as follows:

> I guess what I want to be careful to understand is, the fact that this has religious significance should not affect your decision. Your decision should be, because individuals have the right to express, you know, you can go down and stand on the riverside, riverfront, if you want to, and preach and you can do that, and no one can stop you from doing that, unless you're interrupting traffic or somehow, you know, disrupting things, and to display a symbol of your faith, is also not, I mean, that's something that you have the right to do. The City could not, on its own, put up any religious devices, but an individual has the right to freedom of express [sic]. Your comments about who made the presentation, which is a for-profit company wanting to sell these crosses to churches, is totally valid, and I agree 100 percent with that. I just want to be careful that we don't, just because they're crosses, in my mind, the way I'm treating him [sic] in my mind, is these are statues, and previously for the United Way, they were statues of pigs and steers, and this time it is a statue of a cross, and that's the only difference as far as the Law Department is concerned.

Dkt. No. 20-19 at 9-10.

On June 20, 2013, West Side Christian Church's permit application was resubmitted to the Works Board. Roger Lehman, a representative of the Church, made the oral presentation. Following Mr. Lehman's presentation, the Works Board approved the permit application by a 2-0 vote.[5] Nix Dep. at 9-10; *see* Dkt. No. 20-20 (6/20/13 Board Minutes) at 4. The discussion regarding West Side Christian Church's permit at the June 20 Works Board meeting focused largely on safety and liability concerns and did not address the religious aspects of the display beyond a reference to the City's legal

---

[4] The City's ordinance provides that a "First Amendment sign" is "any sign promoting any cause, party, candidate, idea, or concept; except it does not include advertising signs advertising any business or sale of product or service by a business." § 12.05.210. The Evansville Municipal Code also provides, in pertinent part, that "First Amendment signs may not be placed on or over any paved portion of the street or sidewalk." § 12.05.210(E)(7).

[5] Board member Brooks was not present at this regularly scheduled meeting. Nix. Dep. at 10.

10

counsel's opinion that it would be permissible for the churches to put a plaque on each cross indicating which church was the sponsor of it.  *See* Dkt. No. 20-20 at 1-3.

## IV. The Display of the Crosses

As approved by the Works Board, up to thirty-one, six-foot-tall Crosses would be erected and displayed over a two-week period in an area extending over the previously described four block stretch of the Riverfront between August 4, 2013 and August 18, 2013.  The precise location of each of the Crosses was yet to be determined.  Nix Dep. at 22.  Three proposals existed for the orientation of the Crosses: first, perpendicular to Riverside Drive directly abutting the street; second, perpendicular to Riverside Drive overlooking the Ohio River on the furthest side of the sidewalk from the street; or, third, parallel to Riverside Drive overlooking the Ohio River on the far side of the sidewalk away from the street.  According to the City's legal counsel, the decision regarding the final orientation of the Crosses would be made by the Works Board with input from the participating churches.  *See* Dkt. No. 20-10 at 5-7 (photographs depicting each proposal).

The City is not decorating the Crosses; rather each of the Crosses are to be decorated by Sunday School children affiliated with each individual church participating in the project.[6]  Nix Dep. at 31.  According to discussions occurring during the June 20 Works Board meeting, each church was expected to place a plaque on its respective cross indicating its sponsorship, but the City has since determined that such a sign would also

---

[6] The exact manner in which each cross will be decorated is left to the individual churches to decide and remained unsettled (beyond the restriction that the decorations cannot include writing) at the time of the hearing on Plaintiffs' motion for preliminary injunction.  However, at the hearing, counsel for the West Side Christian Church represented that at least some of the Crosses will be painted by children from the congregations of the participating churches.

11

run afoul of the prohibition on "First Amendment signs," and thus, current plans omit the display of any specific identifiers. *See* Dkt. 23-3 (7/11/2013 Board Minutes) at 6. Although the City will have no involvement in decorating the Crosses, Mr. Nix testified that the Works Board retains the authority to require that individual crosses be taken down if the Board deems the decorations on the crosses to be "inappropriate." Nix Dep. at 31-32. What constitutes "appropriate" is not clear; apparently that determination has been left to the discretion of the Works Board.[7]

      The City has no financial stake in the display of the Crosses, having provided no financial support for the Cross the River project and expecting to receive no financial contributions for the use of the space. It will not be responsible for and will provide no manpower for the construction, transportation, erection or removal of the Crosses. *Id.* at 54. The City is being indemnified as to any liability resulting from the display of the Crosses as the Church, upon direction from the Works Board, through the Church's acquisition of appropriate liability insurance. *Id.* at 52. Approximately three weeks after the Works Board gave its approval of the display of the Crosses, the Board decided during its July 11, 2013 meeting that a disclaimer should be erected both at the front and back of the display, of a size equal to that of one of the Crosses, which will state: "The

---

[7] At the preliminary injunction hearing, counsel for the City and counsel for the Church both argued that the Works Board is empowered to exercise discretion only with regard to safety issues and to regulate the writing on the Crosses. Mr. Nix, however, testified in his deposition that the Works Board has discretion to remove any cross that based on its decorative elements the Board deems inappropriate. Nix Dep. at 31-32. One of the examples cited was the inclusion of a depiction of the devil in response to which Mr. Nix stated that the Works Board has discretion to remove such a cross if the Board considers it inappropriate. *Id.* at 32.

City of Evansville does not endorse the display or its message. The display is sponsored by and funded by a private entity." Dkt. No. 23-3 at 6.

**V.     Plaintiffs**

Plaintiffs are both residents of the City. Cabral Aff. ¶ 1; Tarsitano Aff. ¶ 1. Ms. Tarsitano lives in downtown Evansville and Mr. Cabral works in that same area. Both Plaintiffs regularly pass by the area where the Crosses will be erected; indeed, they traverse it on a daily basis. Cabral Aff. ¶ 10; Tarsitano Aff. ¶ 13. Ms. Tarsitano's residence is located on Riverside Drive, and thus, she will also likely be able to see the Crosses from her window. Tarsitano Aff. ¶ 2, ¶ 13. Her daily travels require her to drive up and down Riverside Drive and she also routinely walks her dog on the Riverfront's greenway, including the area immediately past the space where the Crosses are to be displayed. She has averred that she passes the area where the Crosses are to be displayed multiple times a day. Mr. Cabral passes by the Riverfront area on his way to his work each day. However, he has testified that if the display is erected he intends to find an alternate route to and from work and other downtown locations so as to avoid coming into contact with the Crosses. Cabral Aff. ¶ 11.

## Conclusions of Law

The Establishment Clause of the First Amendment to the Constitution of the United States, which was made applicable to state and municipal governments by the Fourteenth Amendment, *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 849 (7th Cir. 2012) (*en banc*), *cert. pending*, No. 12-755 (citing *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 8 (1947)), provides that "Congress shall make no law respecting an

establishment of religion," U.S. CONST. amend. I, cl. 1.  The Seventh Circuit Court of Appeals has recognized that, although often criticized, the three-pronged test set forth by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), "'remains the prevailing analytical tool for the analysis of Establishment Clause claims.'"  *Elmbrook Sch. Dist.*, 687 F.3d at 849 (quoting *Books v. City of Elkhart (Books I)*, 235 F.3d 292, 301 (7th Cir. 2000)).  Under the *Lemon* test, government action fails constitutional muster if it: (1) lacks a legitimate secular purpose; (2) has the primary effect of advancing or inhibiting religion; or (3) fosters an excessive governmental entanglement with religion.  *See* 403 U.S. at 612-13.

In cases involving religious displays on public property, courts often apply a slightly modified version of the *Lemon* test to determine whether a violation of the Establishment Clause is threatened.  Under this approach, the primary question under *Lemon*'s "primary effect" prong focuses on whether a government practice has "the effect of communicating a message of government endorsement or disapproval of religion." *Lynch v. Donnelly*, 465 U.S. 668, 692 (1984) (O'Connor, J., concurring); *see also Cnty. of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 592-93 (1989) (opinion of Blackmun, J.) ("[W]e have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause jurisprudence.").  The endorsement approach requires the Court to "assess[ ] the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the

14

display amounts to an endorsement of religion." *Books I*, 235 F.3d at 304 (citation omitted). In other words, the question the Court must resolve is "whether an objective, reasonable observer, 'aware of the history and context of the community and forum in which the religious display appears,' would fairly understand the display to be a government endorsement of religion." *Books v. Elkhart County, Ind. (Books II)*, 401 F.3d 857, 867 (7th Cir. 2005) (quoting *Pinette*, 515 U.S. at 780 (O'Conner, J., concurring)).

After careful review of the specific facts before us, we conclude that based on the size and scope of the project, this planned display of crosses would convey a message of the City's endorsement of Christianity to the reasonable observer, and thus, would violate the Establishment Clause. The Latin cross is widely recognized as "the principal symbol of Christianity around the world," *Pinette*, 515 U.S. at 792 (Souter, J., concurring in part and concurring in judgment). It "carries deeply significant meaning for those who adhere to the Christian faith" and "acts as a 'short cut from mind to mind,' for adherents who draw strength from it and for those who do not ascribe to Christian beliefs." *Elmbrook Sch. Dist.*, 687 F.3d at 852 (quoting *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943)). While the message intended to be conveyed by the sponsors of this display of crosses is unambiguous and unequivocal, the constitutional concern rests not with the use of the cross symbol as such, but rather with the oversized, imposing and somewhat overpowering size, scope, and magnitude of the display. That the plans call for it to extend over a four city block expanse of iconic public space within the geographic and cultural center of the community of Evansville and be comprised of

numerous six-foot-tall crosses, will clearly communicate a sectarian message. It is the forcefulness of this message based on the size and scope of the display that catapults it into the range of constitutionally prohibited speech.

In defense of this use, the City and the Church emphasize the history of the Riverfront as a public forum, contending that a reasonable observer of the exhibit would not view it as an endorsement of religion by the City, rather simply as consistent with the City's longstanding practice of allowing a wide variety of types of expression to occur in this place thereby establishing the traditional accommodation of free speech.[8] To the extent this is true, the comparable prior uses have been limited to in-person events approved by the Works Board of both a secular and non-secular nature.[9] Even so, such historic practice does not finally resolve the matter, given that the Supreme Court has

---

[8] Both the City and the Church rely heavily on the Seventh Circuit's *en banc* decision in *Doe v. Small*, 964 F.2d 611 (1992), which addressed display of religious paintings in a city park erected during a Christmas holiday season. However, we do not find that decision particularly instructive in the case before us for several reasons. First, the court in *Small* made clear that the issue it was addressing was whether the district court's injunction was overbroad, not the issue of whether the municipality had in fact endorsed the private organization's religious speech, given that the municipality had not appealed the trial court's decision on that issue. *Id.* at 617. Moreover, the facts in *Small* differ in significant ways from the facts before us. For example, in *Small*, the city park where the religious paintings were to be displayed was open to all private parties to engage in protected expression on a "first come, first served" basis with no prior approval from the municipality required. *Id.* at 613. The display itself at issue in *Small* is also distinguishable from the display of the Crosses at issue here as the religious paintings were accompanied in the city park by other monuments depicting the holiday season that helped to temper the religious message of the display. *Id.* at 614-15.

[9] We note again that the City does not exercise these powers on the basis of an officially adopted or otherwise established policy of equal access. Although the record before us supports the City's contention that it has never denied a right-of-way permit request for content-based reasons, it is clear from Mr. Nix's testimony that the Works Board retains the discretion to deny a request on any grounds it may choose. Moreover, Mr. Nix maintains that, even after approving the display, the Works Board retains discretion to remove any cross that the Board deems "inappropriate."

16

"never held the mere creation of a public forum [to] shield the government entity from scrutiny under the Establishment Clause." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 303 n.13 (2000) (citing *Pinette*, 515 U.S. at 772 (O'Connor, J., concurring in part and concurring in judgment) ("I see no necessity to carve out … an exception to the endorsement test for the public forum context.")).

As Justice O'Connor wrote in her concurrence in *Pinette*,[10] under certain circumstances "whether because of the fortuity of geography, the nature of the particular public space, or the character of the religious speech at issue, among others," 515 U.S. at 778, a private religious organization "may so dominate a public forum that a formal policy of equal access is transformed into a demonstration of approval." *Id.* at 777. We think that is the case here, where because of both the size and scope of the display (including the area covered, the size of each component cross, the number of crosses, and the extended time during which the unattended display will be in place) it threatens to overwhelm and transform the otherwise neutral public forum, creating a demonstration of approval and leading a reasonable observer to believe that the City has endorsed the message.[11]

---

[10] The lead opinion in *Pinette* is a four-justice plurality opinion. Both Justice O'Connor and Justice Souter wrote separate concurrences, each joining the other, as well as Justice Breyer. As the narrowest opinions necessary to the Court's judgment, these concurrences become the controlling opinions. *See Marks v. United States*, 430 U.S. 188, 193 (1977); *Grosjean v. Bommarito*, 302 Fed. App'x 430, 436 n.1 (6th Cir. 2008) ("Under the *Marks* doctrine, it appears that the concurring opinions of Justice Souter and Justice O'Connor were the more narrow, and therefore controlling, grounds for judgment in [*Pinette*].").

[11] Also, as noted *infra*, the Works Board retains the discretion to deny a right-of-way request on any grounds it chooses and to remove individual crosses, even after approving the display. A

The City's previous approvals of other uses of the Riverfront for an overtly religious purpose, such as for sunrise services, prayer vigils, and a March for Prayer, are easily distinguishable from its approval of the proposed display of the Crosses. These prior uses all involved in-person events of short duration, usually lasting only a few hours. In contrast, the display of the Crosses, while not permanent, will extend over a two week period, thereby strengthening the message of endorsement by the City. More significantly, unlike in-person events where the identity of the individual speaker(s) is clearly associated with the message, "an unattended display (and any message it conveys) can naturally be viewed as belonging to the owner of the land on which it stands." *Id.* at 786 (Souter, J., concurring). Here, because the Crosses will constitute an unattended display, a reasonable observer is likely to conclude that the City supports it as well as the message it conveys. Such an endorsement is prohibited by the First Amendment Establishment Clause.

The City's attempts to dilute the religious impact of the display by prohibiting written messages on the Crosses and by requiring disclaimers, while generally commendable, no doubt reflect its own recognition of and sensitivity to the magnitude of the display and the constitutional concerns it raises.[12] We emphasize, it is not the inclusion of the crosses as such that causes this display to run afoul of the First

---

reasonable observer, knowing of this discretion, would be apt to conclude that the City endorses the message based on its approvals.

[12] The parties have stipulated that this case centers on the endorsement analysis. However, we note that, given that the City has no formal neutral policy for approving displays and the Works Board retains discretion to make post hoc determinations regarding appropriateness of the decorations on the Crosses and to remove portions of the display as the Board deems necessary, it may also give rise to entanglement concerns. We leave this issue for another day.

18

Amendment; rather, it is the forcefulness of the message being conveyed, based on the significant scope and size and duration of the overall display.

In reaching this decision, we are keenly aware that "[w]hen federal courts deal with entanglements between government function and private religious faith, we confront some of the most sensitive aspects of our Nation's public life" and that in establishing the required balance between the Establishment Clause and the Free Speech and Free Exercise Clauses, we must "try to ensure that we recognize and protect faith and its importance in our individual, community, and national lives, on the one hand, while avoiding government support, endorsement, and subtle coercion in favor of particular faiths, on the other." *Elmbrook Sch. Dist.*, 687 F.3d at 857 (Hamilton, J., concurring). This ruling should not be understood to foreclose or prohibit any and all unattended displays on the Riverfront area that convey a religious message.  To stay within constitutional bounds, however, it must stop short of creating a message that overwhelms the nature of the public forum thereby transforming it into government endorsed religious speech.

Accordingly, the City is hereby PERMANENTLY ENJOINED from permitting the erection of the display as described and referred to herein as "Cross the River" within the Riverfront area.

IT IS SO ORDERED.

Date:  _____07/31/2013_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Christopher C. Wischer
BAMBERGER, FOREMAN, OSWALD AND HAHN
cwischer@bamberger.com

Michael J. Cork
BAMBERGER, FOREMAN, OSWALD AND HAHN, LLP
mcork@bamberger.com

Bryan H. Beauman
STURGILL, TURNER, BARKER & MOLONEY, PLLC
bbeauman@sturgillturner.com

Keith W. Vonderahe
ZIEMER STAYMAN WEITZEL & SHOULDERS
kvonderahe@zsws.com

Clay W. Havill
ZIEMER STAYMAN WEITZEL & SHOULDERS LLP
chavill@zsws.com